| | |
|---|---|
| LEXI HONEYCUTT, MELISSA MILTENBERGER, PAULA MULLENIX, SHELBY SPRINGER, KELLEY STAMBAUGH, ALLISON TITUS and REAGAN NANZ | Case No. 3:21-cv-311 |
| | Judge Travis R. McDonough |
| *Plaintiffs*, | Magistrate Judge Debra C. Poplin |
| v. | |
| CABINS FOR YOU, LLC, et al, | |
| *Defendants*. | |

# MEMORANDUM OPINION

Before the Court is Plaintiffs Lexi Honeycutt, Melissa Miltenberger, Paula Mullenix, Shelby Springer, Kelley Stambaugh, Allison Titus, and Reagan Nanz's (collectively, "Plaintiffs") motions for default judgment against Defendants Rich Bourgeois ("Rich Howze") and Jonelle Bourgeois, individually and doing business as Sublime Services, and Sublime Plumbing, LLC, (collectively, "Sublime Defendants"), filed pursuant to Federal Rule of Civil Procedure 55(b)(2). (Docs. 173, 174, 175, 176, 177.) Though the Court granted the motions on October 20, 2022 (Doc. 180), it has yet to determine damages. For the reasons that follow, the Court **ASSESSES** the following damages against Sublime Defendants: $697,117.67 for Lexi Honeycutt; $496,306.34 for Reagan Nanz; $375,465.10 for Melissa Miltenberger; $604,045.02 for Shelby Springer; $86,949.60 for Paula Mullenix; $324,930.65 for Allison Titus; and $114,970.60 for Kelley Stambaugh.

## I. BACKGROUND

On May 20, 2021, Plaintiffs traveled to Gatlinburg, Tennessee, to stay in a cabin ("Cabin") owned by Defendants Scott and Jenn Osborne ("the Osbornes") and managed by Defendant Cabins for You, LLC ("Cabins for You"). (Doc. 59, at 7–8.) Shortly after arriving at the Cabin, Plaintiffs began experiencing nausea, vomiting, headaches, dizziness, and seizures—symptoms of acute carbon-monoxide poisoning. (*Id.* at 9.) Blood tests revealed that Plaintiffs had been exposed to dangerously high levels of carbon monoxide, which they argue caused them to sustain permanent injuries. (*Id.*) According to Plaintiffs, Sublime Defendants installed the water heater and associated plumbing and ventilation systems at the Cabin at the time of its construction. (*Id.* at 7–8.) Defendants Rich Howze and Jonelle Bourgeois are the owners and operators of Sublime Services, a sole proprietorship doing business in Tennessee. (Doc. 59, at 5–6.) Jonelle Bourgeois is the sole member of Sublime Plumbing, LLC, a domestic limited-liability corporation with its principal place of business in Tennessee. (*Id.* at 6.)

On August 31, 2021, Plaintiffs initiated the present action (Doc. 1), and, on May 5, 2022, Plaintiffs amended their complaint (Doc. 59) to add additional defendants allegedly involved in the manufacturing and installation of the water heater and carbon-monoxide detector(s) at the Cabin, bringing a combination of negligence and product-liability claims against those parties. In their amended complaint, Plaintiffs assert that Sublime Defendants were negligent in their failure to properly install the Cabin's water heater and associated plumbing and ventilation and in failing to warn of the gas water heater's dangerous condition. (*Id.* at 17–18.) As a result, Plaintiffs allege, Sublime Defendants directly and proximately caused them to suffer "severe and permanent injuries, endure[] great physical pain and mental suffering, incur[ ] substantial medical expenses, [and] los[e future and present] wages." (*Id.* at 18.)

Sublime Defendants never responded to the complaint or otherwise appeared in this action, and, on September 13, 2022, Plaintiffs applied for the clerk's entry of default against each non-appearing Sublime Defendant—Rich Howze, Jonell Bourgeois, individually and doing business as Sublime Services, and Sublime Plumbing, LLC (Docs. 144, 145, 146, 147, 148). The Clerk entered default against these individuals and entities on October 5, 2022 (Docs. 158, 159, 160, 161, 162). Plaintiffs then moved for default judgment against each Sublime Defendant (Docs. 173, 174, 175, 176, 177). On October 20, 2022, the Court granted default judgment against Sublime Defendants, noting that it would "delay holding a hearing to determine damages against non-appearing Defendants until claims pending against remaining Defendants [were] resolved." (Doc. 180, at 1.) Since that time, the remaining Defendants have settled or are currently in the process of settling Plaintiffs' claims against them, and the Court has advised Plaintiffs that a formal hearing to assess damages against Sublime Defendants may not be necessary if they are able to provide sufficient evidence to support each Plaintiff's requested amount.

Pursuant to this direction, Plaintiffs provided the Court with nearly five-hundred pages of evidence supporting the damages sought for their injuries—consisting of medical records, expert estimates of lost earning capacities, and other documents. (*See* Docs. 379-1–379-29.) Lexi Honeycutt requests $3,485,588.36 in damages: $93,517.86 in charged medical expenses; $2,642,070.50 for future economic impact; and $750,000.00 in non-economic damages. (*Id.* at 2.) Reagan Nanz requests $123,880.71 in charged medical expenses, $1,607,651.00 for future economic impact; and $750,000.00 in non-economic damages, for a total of $2,481,531.71. (*Id.* at 4.) Melissa Miltenberger requests $1,535.00 in charged medical expenses, $1,125,790.50 for future economic impact, and $750,000.00 in non-economic damages, totaling $1,877,325.50.

(*Id.* at 5.)  Shelby Springer requests $3,020,225.10 in damages, comprised of $102,029.10 in charged medical expenses, $2,168,196.00 for future economic impact, and $750,000.00 in non-economic damages.  (*Id.* at 6.)  Paula Mullenix does not request any medical expenses, but requests $59,748.00 for loss of earning capacity and $375,000.00 in non-economic damages, for a total of $434,748.00.  (*Id.* at 7.)  Allison Titus requests $67,390.26 in charged medical expenses, $807,263.00 for future economic impact, and $750,000.00 in non-economic damages, for a total of $1,624,653.26.  (*Id.* at 9.)  Kelley Stambaugh asks for a total of $574,853.00 in damages, consisting of $199,853.00 for future economic impact and $375,000.00 in non-economic damages.  (*Id.* at 10.)

At the Court's urging, Plaintiffs also submitted documentation supporting a fault allocation of approximately 20% to Sublime Defendants.  (Doc. 381.)  According to Plaintiffs, Sublime Plumbing, LLC, through the work of Rich Howze, incorrectly installed the gas water heater, which "led to the water heater's combustion process producing excessive amounts of carbon monoxide inside the Cabin."  (*Id.* at 1–2.)  In support of this assertion, Plaintiffs submit a report from Joseph Leane, whom they retained as a mechanical engineer expert.  (*Id.* at 2.)  Leane testified that, from his observations, the improperly installed water heater "caused that appliance to produce dangerously excessive levels of carbon monoxide" within the Cabin.  (Doc. 381-3, at 33.)  Plaintiffs also filed invoices from Sublime Defendants for the water-heater installation (Doc. 381-2) and a partial deposition transcript from Brian Carroll, who constructed the Cabin and subcontracted with Sublime Defendants to install the water heater (Doc. 381-1).  Plaintiffs also pin Sublime Defendants' share of liability at 20% in light of their allegations against other Defendants in the case.  (Doc. 381, at 3.)  To date, Sublime Defendants have not appeared in this matter.

4

## II. STANDARD

Applications for default judgment are governed by Rule 55 of the Federal Rules of Civil Procedure. Following the Clerk's entry of default pursuant to Rule 55(a) and the plaintiff's application for default judgment under Rule 55(b), the complaint's factual allegations regarding liability are taken as true, while allegations regarding damages must be proven. *Vesligaj v. Peterson*, 331 F. App'x 351, 355 (6th Cir. 2009). To determine damages, "[t]he district court must instead conduct an inquiry in order to ascertain the amount . . . with reasonable certainty." *Id.* (quoting *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)). Additionally, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). The party seeking default judgment bears the burden of establishing compensatory damages to a reasonable degree of certainty by a preponderance of the evidence. *Flynn v. People's Choice Home Loans, Inc.*, 440 F. App'x 452, 457 (6th Cir. 2011); *Eggert v. Meritain Health, Inc.*, 428 F. App'x 558, 563 (6th Cir. 2011) (citations omitted). "[C]ourts have considerable latitude in determining the appropriate award through an independent evaluation of the plaintiff's alleged damages." *RQSI Glob. Asset Allocation Master Fund, Ltd. v. APERCU Int'l PR LLC*, No. 3:15-cv-00778, 2019 WL 1922052, at *5 (W.D. Ky. Feb. 22, 2019), *report and recommendation adopted*, No. 3:15-cv-778, 2019 WL 1922045 (W.D. Ky. Mar. 29, 2019).

Pursuant to Federal Rule of Civil Procedure 55(b)(2), a court may, but is not required to, hold a hearing to determine damages that are not for a sum-certain; in lieu of a hearing, a court may review sworn affidavits sufficient to establish the amount of damages. *See I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*, No. 3:19-cv-00981, 2020 WL 4735031, at *3 (M.D. Tenn. Aug. 14, 2020) ("In order to determine damages, the court can, but is not required

5

Case 3:21-cv-00311-TRM-DCP   Document 382   Filed 05/16/23   Page 5 of 14   PageID #: 6387

to, hold an evidentiary hearing. '[A] hearing is not necessarily required if the moving party submits uncontested, sworn affidavits sufficient to establish the amount of damages.'") (alteration in original) (quoting *Broad. Music, Inc. v. Marler*, No. 1:09-cv-193, 2009 WL 3785878, at *5 (E.D. Tenn. Nov. 12, 2009)); Fed. R. Civ. P. 55(b)(2) (A district court "*may* conduct hearings . . . when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter.") (emphasis added)); *Vesligaj*, 331 F. App'x at 354 ("[Rule 55(b)(2)], by its terms, allows but does not require the district court to conduct an evidentiary hearing.") (citation omitted). !

### III. ANALYSIS

As a preliminary matter, the Court does not find that an evidentiary hearing is needed given Plaintiffs' submission of hundreds of pages of medical records, expert affidavits, and other pertinent documentation to support the amount requested and the suggested apportionment of fault, as well as Sublime Defendants' total failure to appear in this matter. *See Disney Enters. v. Farmer*, 427 F. Supp. 2d 807, 814 (E.D. Tenn. 2006) (concluding that "no valid purpose would be served in requiring either an evidentiary hearing or oral argument" in determining default-judgment damages when defendant never appeared and plaintiffs "submitted considerable undisputed evidence supporting their requests for [damages and attorneys' fees]"); *see also I Love Juice Bar Franchising*, 2020 WL 4735031, at *4 (finding no need to hold an evidentiary hearing to assess default-judgment damages in light of defendants' lack of response and plaintiff's submission of sworn affidavits in support of their request for damages). Therefore, the Court will rely on Plaintiffs' submitted documents to determine what damages against Sublime

Defendants have been established to a reasonable degree of certainty. *Flynn*, 440 F. App'x at 457; *Eggert*, 428 F. App'x at 563 (citations omitted).

### A. Total Damages

In tort cases, there are a number of compensation categories, or "elements," to consider when determining damages, such as medical expenses, loss of earning capacity, pain and suffering, permanent injury, disfigurement, and loss of enjoyment of life. *See Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 715 (Tenn. Ct. App. 1999). "[T]he proof of damages [in such cases] need not be exact or mathematically precise[,]" and the amount of damages assessed "is not controlled by fixed rules of law or mathematical formulas." *Id.* at 703 (internal citation omitted) (first citing *Provident Life & Accident Ins. Co. v. Globe Indem. Co.*, 3 S.W.2d 1057, 1058 (Tenn. 1928); then citing *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 274 (Tenn. Ct. App. 1990); then citing *Blalock v. Temple*, 276 S.W.2d 493, 497 (Tenn. 1954); and then citing *Brown v. Null,* 863 S.W.2d 425, 429–30 (Tenn. Ct. App. 1993)). Rather, "[e]vidence required to support a claim for damages need only prove the amount of damages with reasonable certainty." *Id.* (first citing *Airline Constr.*, 807 S.W.2d at 274; and then citing *Redbud Coop. Corp. v. Clayton*, 700 S.W.2d 551, 561 (Tenn. Ct. App. 1985)). Here, Plaintiffs request damages for three primary categories, which the Court will address in turn: (1) charged medical expenses; (2) future economic impact; and (3) non-economic damages. (*See* Doc. 379.)

### i. *Charged Medical Expenses*

Plaintiffs request a total of $388,352.93 in charged medical expenses, providing extensive medical records and reports in support of the claim. (*See* Doc. 379.) In *Dedmon v. Steelman*, the Tennessee State Supreme Court confirmed that a plaintiff is entitled to recover the full, undiscounted value of any reasonable and necessary medical expenses she has incurred as a

result of the defendant's negligence. 535 S.W.3d 431, 438 (Tenn. 2017). Absent contrary evidence presented by the defendant, a plaintiff is entitled to a statutory presumption that her requested medical expenses are reasonable. *See* Tenn. Code. Ann. § 24-5-113. This presumption "can apply to medical expense claims of any size." *Dedmon*, 535 S.W.3d at 439.

Taking Plaintiffs' liability allegations as true, Sublime Defendants' negligent installation of the carbon-monoxide-emitting water heater caused Plaintiffs' injuries—carbon-monoxide poisoning—for which most of them received medical treatment. (*See* Doc. 59, at 17–18.) To demonstrate the amount of expenses incurred for this treatment, Plaintiffs submitted itemized medical bills for Lexi Honeycutt, (Doc. 379-4), Reagan Nanz (Doc. 379-9), Melissa Miltenberger (Doc. 379-13), Shelby Springer (Doc. 379-18), and Allison Titus (Doc. 379-26). The bills list charges for the Gatlinburg Fire Department's services, transport costs for air-lifting some Plaintiffs out of the Cabin and transporting them to the hospital, and other hospital costs. (*See generally* Docs 379-4, 379-9, 379-13, 379-18, 379-26.) Considering the statutory presumption of reasonableness and that all services appear to involve treatment for the carbon-monoxide poisoning caused in part by Sublime Defendants' negligence, Plaintiffs have sufficiently demonstrated the expenses' reasonableness and necessity.

### ii. Future Economic Impact

Plaintiffs next request compensation for their loss of future earning capacity as a result of their injuries. Under Tennessee law, '[l]oss or impairment of future earning capacity is an element of damages in a personal injury action." *Overstreet*, 4 S.W.3d at 703 (citations omitted). Even when an injured plaintiff does not incur a loss of earnings, she may nonetheless have suffered a loss of earning capacity. *Id.* (citing *S. Coach Lines v. Wilson*, 214 S.W.2d 55 (Tenn. App. 1948)). "Earning capacity refers not to actual earnings, but rather to the earnings that a

person is capable of making[,]" as demonstrated by "age, health, intelligence, capacity and ability to work, experience, training, record of employment, and future avenues of employment." *Id.* at 703–04 (citations omitted). When the injured plaintiff is a student, a court may consider her anticipated career trajectory in assessing damages for impaired future earning capacity. *Id.* at 704. "Thus, a student may present evidence of his or her educational accomplishments and plans and of the earning potential of persons engaged in the profession or career the student intends to pursue, as long as the evidence is not wildly speculative." *Id.* (collecting cases). "The extent of an injured person's loss of earning capacity is generally arrived at by comparing what the person would have been capable of earning but for the injury with what the person is capable of earning after the injury." *Id.* at 703–04 (citations omitted).

Here, Plaintiffs retained a vocational expert, economist Sara Ford, to project their future loss of earning capacities. To arrive at each estimate, Ford conducted a vocational economic assessment based on the Vocational Economic Rationale ("VER")—a methodology her firm commonly applies "to assess earning capacity in all cases of either partial or total disability." (*See, e.g.*, Doc. 379-5, at 1.) Ford's report for each Plaintiff includes a section explaining the process used to arrive at each future loss of earnings estimate, which the Court summarized as follows in its opinion denying a *Daubert* motion seeking exclusion of Ford's testimony: "To determine lost earning capacity in this case, Ford evaluated the individual circumstances— including medical, educational, and work histories—of each Plaintiff, paired this information with relevant population statistics, then calculated the present value of each Plaintiff's projected loss." (Doc. 320, at 13–14.) Though, as this Court acknowledged in its opinion, Ford's "calculations do incorporate some assumptions, such as Plaintiffs' future education levels," the assumptions are anchored by a sufficient factual foundation—Plaintiffs' medical records, school

9

records, work histories, and relevant statistical information. (*Id.* at 15.) For each estimate, Plaintiffs propose the Court awards the midpoint of the damages range provided by Ford, positing that such an amount "would serve as an appropriate measure for this element of damage" for each Plaintiff. (*See, e.g.*, Doc. 379, at 2.) Because Ford's estimates rely on extensive data specific to each Plaintiff and national statistics, employ a standard and reliable methodology (*See* Doc. 320, at 14–17), and hew close to Tennessee law's instruction to "compare what the person would have been capable of earning but for the injury with what the person is capable of earning after the injury," the Court finds they have been established with reasonable certainty. *Overstreet*, 4 S.W.3d at 703–04.

### iii. *Past and Future Pain and Suffering, Mental Anguish, and Loss of Enjoyment of Life*

Finally, Plaintiffs request compensation for non-economic damages. All but two Plaintiffs requested $750,000—"the maximum amount of non-economic damages allowed under Tennessee law." *See* Tenn. Code Ann. § 29-39-102(a)(2) ("In a civil action, each injured plaintiff may be awarded[] . . . [c]ompensation for any noneconomic damages suffered by each injured plaintiff not to exceed seven hundred fifty thousand dollars ($750,000) for all injuries and occurrences that were or could have been asserted . . . ."); (*see, e.g.*, Doc. 379, at 2.) Non-economic damages can account for a variety of elements, including physical pain and suffering, emotional pain and suffering, and the loss of ability to enjoy life. *See McClay v. Airport Mgmt. Servs., LLC*, 596 S.W.3d 686, 688 (Tenn. 2020).

The Court finds Plaintiffs' non-economic damages requests to be supported by the extensive record provided. Each Plaintiff justifies her request for non-economic damages by stating the award is merited in light of "the severity of the impact of the CO poisoning" on her life, which is elaborated upon in the attached medical records and expert reports. (*See, e.g.*, Doc.

379, at 2.) For example, a neuropsychological evaluation for Lexi Honeycutt notes that she continues to "report a constellation of physical, fatigue, visual, cognitive and emotional coping deficits totally consistent with Carbon Monoxide Poisoning," which "are considered to be permanent" given their persistence thirteen months post-exposure. (Doc. 379-2, at 16.) Based on this information and that provided for the other Plaintiffs, the Court can reasonably conclude they have suffered significant physical and emotion pain as a result of their carbon-monoxide exposure, for which the requested non-economic compensation is reasonable.

B. **Allocation of Fault**

In this case, multiple other parties and nonparties have either entered into settlement agreements with Plaintiffs or are in the process of doing so. (*See* Docs. 245, 377.) Nonetheless, Tennessee law permits the allocation of fault to settling parties to determine the fault of remaining parties, which serves the purpose of comparative fault in linking a party's liability to its degree of fault in causing a plaintiff's damages. *See* Tenn. Code Ann. § 29-11-107 ("[A]llocation of fault to nonparties," including "a settling party," "shall be used only to determine the liability of named parties and shall not subject nonparties to liability in the action in which the allocation occurred or in any other action"); *see also McNabb v. Highways, Inc.*, 98 S.W.3d 649, 654 (Tenn. 2003) ("The purpose of comparative fault under *McIntyre* is to link one's liability to his or her degree of fault in causing a plaintiff's damages.") (citing *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992)); *Carroll v. Whitney*, 29 S.W.3d 14, 21 (Tenn. 2000) (noting Tennessee "broadly permit[s] allocation of fault to all persons involved in an injury-causing event"); *Green v. Johnson*, No. E2006-02666-COA-R3CV, 2007 WL 2126394, at *1 (Tenn. Ct. App. July 25, 2007) (noting that the court "assessed fault at 65% to Johnson and Conner"—defaulted parties—and "35% to The Pub and its owners/employees[,]" who had

settled their claims), *aff'd*, 249 S.W.3d 313 (Tenn. 2008).  Allocation of fault should be "dependent upon all the circumstances of the case," which may include consideration of one or more of the following factors:

> (1) the relative closeness of the causal relationship between the conduct of the defendant and the injury to the plaintiff; (2) the reasonableness of the party's conduct in confronting a risk, such as whether the party knew of the risk, or should have known of it; (3) the extent to which the defendant failed to reasonably utilize an existing opportunity to avoid the injury to the plaintiff; (4) the existence of a sudden emergency requiring a hasty decision; (5) the significance of what the party was attempting to accomplish by the conduct, such as an attempt to save another's life; and (6) the party's particular capacities, such as age, maturity, training, education, and so forth.

*Eaton v. McLain*, 891 S.W.2d 587, 592 (Tenn. 1994).

Plaintiffs estimate Sublime Defendants' share of fault to be approximately 20%, and the Court finds this to be an appropriate allocation of fault in light of Plaintiffs' allegations against other parties and supporting documentation.  (Doc. 381, at 3.)  Plaintiffs supplement their estimate with a number of affidavits, including an engineer's expert report proclaiming with "a reasonable degree of engineering certainty" that:  (1) the water heater installed by Sublime Defendants "produced dangerously excessive levels of carbon monoxide" at the time of the incident; (2) the improper installation "caused the appliance to produce dangerously excessive levels of carbon monoxide"; and (3) the heater was not installed in compliance with the manufacturer's installation instructions or the relevant local building codes.  (Doc. 381-3, at 32–33.)  Though Plaintiffs allege other parties—namely Ambient Heating & Air, Scott and Jenn Osborne, LLC, Cabins for You, LLC, Evergreen Design & Construction, LLC, and Brian Carroll—also contributed to their injuries (*see generally* Doc. 59), the causal relationship between the improperly installed heater and the carbon-monoxide emissions that injured Plaintiffs appears to be close enough to warrant a non-negligible allocation of fault to Sublime

Defendants. *See Eaton*, 891 S.W.2d at 592. Therefore, the Court finds 20% to be an appropriate fault designation and will reduce the total amount of damages assessed against Sublime Defendants accordingly.

### C. Damages Calculations for Individual Plaintiffs

Finding all requested damages to be established to a reasonable certainty, the Court will now calculate the amount to be awarded to each Plaintiff. Lexi Honeycutt requested $3,485,588.36 in total damages, meaning $697,117.67 will be assessed against Sublime Defendants and awarded to her. Reagan Nanz requests a total of $2,481,531.71; therefore, $496,306.34 will be assessed against Sublime Defendants and awarded to her. Melissa Miltenberger asks for $1,877,325.50 in total damages. As a result, $375,465.10 will be assessed against Sublime Defendants and awarded to her. Shelby Springer requests $3,020,225.10 in damages, and thus $604,045.02 will be assessed against Sublime Defendants and awarded to her. Because Paula Mullenix requests a total of $434,748.00, $86,949.60 will be assessed against Sublime Defendants and awarded to her. Allison Titus requests a total of $1,624,653.26; therefore $324,930.65 will be assessed against Sublime Defendants and awarded to her. Finally, Kelley Stambaugh requested a total of $574,853.00 in damages, so $114,970.60 will be assessed against Sublime Defendants and awarded to her.

### IV. CONCLUSION

For the reasons stated above and consisted with Federal Rule of Civil Procedure 55(b), the Court **ASSESSES** the following damages against Sublime Defendants for each Plaintiff: $697,117.67 for Lexi Honeycutt; $496,306.34 for Reagan Nanz; $375,465.10 for Melissa Miltenberger; $604,045.02 for Shelby Springer; $86,949.60 for Paula Mullenix; $324,930.65 for Allison Titus; and $114,970.60 for Kelley Stambaugh.

**AN APPROPRIATE JUDGMENT WILL ENTER.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**